**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 19, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ADAM MAHOMED,

      Petitioner,

v.

ERIC H. HOLDER, JR., Attorney
General of the United States,

      Respondent.

No. 11-9562
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

---

Mr. Adam Mahomed, a native and citizen of Zimbabwe, petitions for review of

the September 2, 2011, order of the Board of Immigration Appeals (BIA) that denied

his application for asylum, withholding of removal, and protection under the United

Nations Convention Against Torture (CAT).  We have jurisdiction under 8 U.S.C.

§ 1252(a) and deny the petition for review.

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  Background

Mr. Adam Mahomed was born in and lived in Harare, Zimbabwe, but his family is of Indian descent.  He is unmarried and has no children.  There is a discrepancy in the materials as to his age, but his asylum application shows his birthdate as August 18, 1984, meaning that he turned twenty-eight this year.  Admin. R. at 405.  His father, mother, and two younger brothers entered the United States as visitors in December of 2007 and were all granted asylum in 2009 based on his father's application.  Mr. Adam Mahomed entered the United States as a visitor in October 2008, approximately eleven months after the rest of his immediate family.  He overstayed his visa and, in September 2009, timely applied for asylum, withholding of removal, and protection under the CAT.  The Department of Homeland Security initiated removal proceedings in December of that same year.

On appeal, Mr. Adam Mahomed asserts that his asylum claim was based on his political opinion and Indian ethnicity.  Pet. Opening Br. at 11, 23.  He and his father, Mahomed Jassab Mahomed, testified at the hearing.  Mr. Adam Mahomed testified that he was afraid of members or supporters of the Zimbabwe African National Union-Patriotic Front (ZANU-PF) political party and the "war veterans," which he said was the organized crime unit of the ZANU-PF.  Admin. R. at 178.  The ZANU-PF is the ruling party, but Mr. Adam Mahomed said that he supported the opposition party, the Movement for Democratic Change (MDC).  The MDC is led by Morgan Tsvangirai, who was elected prime minister of Zimbabwe in 2008 when a

unity government was formed.  Mr. Adam Mahomed has never met him.  His father was a card-carrying member of the MDC and regularly donated money to the party.  Mr. Adam Mahomed testified that he was not a party member because his father was scared of what could happen to him, but he had attended one MDC party meeting in February 2008 and had donated the equivalent of US $1000 on one occasion.

Mr. Mahomed Mahomed described Zimbabwe as a country where "whites lived in an area, the Indians lived in an area, and the blacks lived in an area." *Id.* at 251.  Mr. Adam Mahomed testified that he worked for his father's profitable transportation business in Zimbabwe and that he and his father were threatened several times by the war veterans.  He said that they reported some of these incidents to the police, but the police not only failed to act upon the reports, they harassed Mr. Adam Mahomed and his family and assaulted his father.

Mr. Adam Mahomed and his father described two incidents in which they said they ran afoul of the war veterans.  In early 2007, they went to a farm in Beatrice, thirty or so miles south of Harare, to check up on a company truck that had been sent to pick up a load of lumber.  Approximately ten men with AK-47 rifles approached them; some of them were wearing ZANU-PF T-shirts.  The men pointed their rifles at the necks of Mr. Adam Mahomed and his father and threatened to kill them.  Mr. Mahomed Mahomed begged for their lives, trying to explain that they had been contracted to pick up lumber there.  The men said that they had taken over the farm and killed the white owner, and that they would kill Mr. Adam Mahomed and his

father, too—that people of their race should stay in Harare. The man who had made the contract with Mr. Adam Mahomed and his father—a black man—came to the scene and explained the situation, and Mr. Adam Mahomed and his father were allowed to leave. Mr. Adam Mahomed and his father did not report this incident to the police because Mr. Adam Mahomed believed that the police, the war veterans, and the army were all one.

Mr. Adam Mahomed and his father also described a 2007 incident when one of his father's company trucks bumped into a war veteran's truck. Although the damage was not too serious and both trucks were insured, the war veteran demanded a brand new truck. Mr. Adam Mahomed and his father reported this incident to the police, but the police said that they could do nothing if a war veteran was involved because it was a political matter. Mr. Mahomed Mahomed went into hiding for a few days. The war veteran called Mr. Adam Mahomed on the phone a couple of times. On one call, the war veteran threatened to kill both Mr. Adam Mahomed and his father if they did not replace his truck. Mr. Mahomed Mahomed got another person in the transport business involved—a black person—to help resolve the matter.

Mr. Adam Mahomed and his father also described a 2007 incident when three policemen came to their home late at night on bicycles, asked if the family were members of the MDC (which the family denied), and then searched and "manhandled" the family. *Id.* at 193. They asked Mr. Mahomed Mahomed why he was in a particular African township two days earlier; he responded that he was

- 4 -

dropping off second–hand goods for poor children. The police then demanded that Mr. Mahomed Mahomed drive them to the police station in the family car. Their bikes were loaded in the trunk. Before they got to the police station, however, the police told Mr. Mahomed Mahomed to stop the car, told him that he should not be in the poor townships, and pushed him to the ground. He cut his head when he fell. But then the police took their bikes and left, and Mr. Mahomed Mahomed drove home. Mr. Mahomed Mahomed did not seek treatment for his injury (except from his wife), but he was terrified, and he soon left for the United States with his wife and two youngest sons. Mr. Adam Mahomed admitted that the family suffered no serious injuries during this incident; he said that he was pushed a few times, just hard enough that he had to take a step or two backwards and had bruises.

Mr. Adam Mahomed remained in Zimbabwe for nearly a year after his immediate family left, managing his father's transportation business and thinking that he would be all right once his father was gone. During this time, he made four or five business trips to South Africa, which he liked to do because he was able to avoid the people who were looking for him in Zimbabwe. (His father kept a rental home in Johannesburg, South Africa, for business reasons.) He said that he returned to Zimbabwe for less than a month each time he was back, and he sometimes stayed at his grandmother's house. His uncle told him that on three occasions while he was absent, members of the ZANU-PF came to his house and asked where he was.

Mr. Adam Mahomed also testified about problems he had with ZANU-PF adherents, including one 2008 incident when he was approached on the street, handed ZANU-PF campaign flyers, and told to "vote wisely and vote for ZANU-PF." *Id.* at 178. At that point, he decided to leave Zimbabwe for the United States. He did not seek asylum in South Africa because he did not know the procedure, because his father was in the United States, and because Zimbabweans are known to have a lot of influence in South Africa. His uncle has taken care of the Mahomeds's home and business since they left; his uncle told him that members of the ZANU-PF party continued to look for him after he left Zimbabwe.

To support his asylum claim, Mr. Adam Mahomed submitted numerous articles about Zimbabwe and three letters—from the Honorable C. Chisvurre, a Member of Parliament who is a member of the MDC, the Honorable Tendai Biti, Secretary General of the MDC, and his uncle. Mr. Adam Mahomed admitted that his uncle obtained the letters, and that he, Mr. Adam Mahomed, had never met Mr. Chisvurre, Mr. Biti, or the employee in Mr. Biti's office who had signed the letter on Mr. Biti's letterhead. He also admitted that Mr. Chisvurre wrote in his letter that he, Mr. Adam Mahomed, was a member of the MDC and a party activist, which was not accurate. He also admitted that Mr. Chisvurre wrote what he had been told by Mr. Adam Mahomed's father and uncle. And Mr. Adam Mahomed also admitted that Mr. Biti wrote that he, Mr. Adam Mahomed, was going to the United States to safeguard his life, but Mr. Biti had no reason to know that.

The immigration judge (IJ) concluded that Mr. Adam Mahomed and his father were credible witnesses, but that Mr. Adam Mahomed failed to establish either past persecution or a well-founded fear of future persecution on account of any protected ground. The IJ carefully reviewed the letters from Mr. Chisvurre, Mr. Biti, and Mr. Adam Mahomed's uncle, but the IJ concluded that they did not provide meaningful corroborative support for Mr. Adam Mahomed's alleged fear of future persecution because the letters were vague and speculative, and they contradicted Mr. Adam Mahomed's own testimony about his limited involvement with the MDC.

The IJ also expressed "concern[] whether the respondent has established that the harm he fears or that the harm he suffered in the past is on account of any protected ground." *Id.* at 72. The IJ acknowledged that the incident in Beatrice might have been based in part on ethnicity, but he reasoned that because the incident was resolved with the assistance of an African, the protected ground of Mr. Adam Mahomed's ethnicity was not a central reason for any threats made on that occasion. The IJ viewed the incident involving the minor vehicle accident with a war veteran in the same way. With regard to the police visit to the Mahomeds's home late at night, the IJ concluded that Mr. Adam Mahomed had established that the motive for the visit was solely or largely on account of the protected ground of political opinion. The IJ went on to conclude, however, that the subsequent incident where Mr. Adam Mahomed was approached on the street by ZANU-PF adherents was not connected

- 7 -

with the earlier police visit, "and the Court is largely left to wonder the specific reasons for ZANU-PF's interest in the respondent in going to the respondent's home or inquiring as to his whereabouts following the departure of the respondent's father from Zimbabwe." *Id.* at 75. The IJ concluded that "there is no direct evidence that suggests the ZANU-PF has indeed attached an adverse political opinion to the respondent other than the incident in 2007." *Id.* at 76.

The IJ also concluded that Mr. Adam Mahomed had not suffered past persecution. The only physical harm Mr. Adam Mahomed suffered in any of the incidents was being pushed, and although the threat in Beatrice was "a very serious threat that could rise to the level of persecution," the IJ had already decided that it was not tied to a protected ground, and there were no other threats. *Id.*

The IJ reviewed the material on country conditions, acknowledging that "the most recent *Human Rights Report* for Zimbabwe . . . paints a very disturbing picture of conditions in Zimbabwe." *Id.* at 77. But he pointed out that Mr. Adam Mahomed had repeatedly left and returned to Zimbabwe between November 2007 and October 2008 without any problems either at a port of entry or in Harare. The IJ concluded that Mr. Adam Mahomed's voluntary, repeated return to Zimbabwe "undermines his claim of a well-founded fear of future persecution." *Id.* at 80. The IJ further concluded that Mr. Adam Mahomed had failed to demonstrate that he could not relocate within Zimbabwe to avoid persecution, considering that his family's company "conducted business throughout the country," his family "is or was fairly

well-to-do," and the business remained ongoing. *Id.* at 82. Finally, the IJ rejected Mr. Adam Mahomed's claims for withholding of removal and protection under the CAT, which both require a higher burden of proof than asylum. The IJ granted Mr. Adam Mahomed's request for voluntary departure.

On appeal to the BIA, Mr. Adam Mahomed argued that the IJ "erred in determining that he lacked sufficient corroboration to meet his burden of proof." *Id.* at 3. But the BIA agreed with the IJ's analysis of Mr. Adam Mahomed's asylum claim. The BIA agreed that Mr. Adam Mahomed had not submitted sufficient corroborating evidence because the letters from Mr. Chisvurre and Mr. Biti lacked specificity. The BIA also agreed that the incidents of mistreatment Mr. Adam Mahomed had described did not amount to persecution under Tenth Circuit law, and that Mr. Adam Mahomed had failed to establish a well-founded fear of future persecution because he had not shown that he had been identified as a supporter of the MDC, so his fear of future persecution was not objectively reasonable. The BIA also noted that Mr. Adam Mahomed had traveled outside Zimbabwe on several occasions without harm, and his voluntary return to Zimbabwe and his family's home undermined his claimed fear of future persecution. The BIA also agreed with the IJ that Mr. Adam Mahomed had failed to show that it would be unreasonable for him to relocate to another part of Zimbabwe. Finally, the BIA agreed that Mr. Adam Mahomed had not met the higher burden of proof for withholding of removal or protection under the CAT.

III.  Issues on Appeal and Discussion

In the body of his opening brief, Mr. Adam Mohamed raises five issues.[1]  With regard to the denial of asylum, he argues that his application for asylum based on his Indian ethnicity and political opinion was supported by substantial evidence because (1) the testimony adduced at the hearing was found to be credible, and "the lack of corroboration by the submitted letters should be given very little weight if any weight at all," Pet. Opening Br. at 33; (2) he is a "refugee," as that term is defined in immigration law, 8 U.S.C. § 1101(a)(42); (3) it should be presumed that he has a well-founded fear of future persecution because of the past persecution he suffered; and (4) even if he did not establish past persecution to be entitled to the presumption, he established a well-founded fear of future persecution through the evidence.  He also argues that substantial evidence supported his application for withholding of removal and protection under the CAT.

Unfortunately, the manner in which Mr. Adam Mahomed presents his issues, both factual and legal, leaves us unable to provide any relief to him.  He argues at length that his asylum claim was supported by substantial evidence.  Yet Mr. Adam Mahomed does not even mention our deferential standard for review for the agency's factual findings, let alone present any argument in light of this standard.  We do not

---

[1]     There are discrepancies between the issues argued in the body of the brief and the statement of the issues at the beginning of the brief.  We attribute these differences to scrivener's error.

review the facts of his claim ab initio; rather, "[we] review the BIA's factual findings under the substantial-evidence standard." *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006). Under this standard, "[t]he BIA's findings of fact are conclusive unless the record demonstrates that 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. §1252(b)(4)(B)). "Our role is not to re-weigh the evidence or to evaluate the credibility of witnesses." *Id.* Mr. Adam Mahomed does not make any argument that the evidence *compels* a conclusion contrary to any of the agency's findings. Moreover, our review of the record and the procedural history convinces us that he cannot meet this high standard.

In addition, Mr. Adam Mohamed's legal argument is also without merit. He argues that we have held that "'an asylum applicant's otherwise credible testimony constitutes sufficient evidence to support an application.'" Pet. Opening Br. at 27 (quoting *Solomon v. Gonzales*, 454 F.3d 1160, 1164-65 (10th Cir. 2006)). And he argues that "the lack of corroboration by the submitted letters should be given very little weight if any weight at all." *Id.* at 33. We understand him to suggest that because the IJ found the testimony credible, no further corroboration was necessary, and the agency should have disregarded the letters he submitted in support of his asylum claim.

There are two problems with Mr. Adam Mahomed's argument. First, the legal standard we applied in *Solomon* has been superseded by Act of Congress. Mr. Adam Mahomed filed his asylum application in September 2009, after the May 11, 2005,

- 11 -

effective date of the REAL ID Act of 2005. As a result, all of the provisions of the REAL ID Act apply to this case, including the new statutory provisions setting out the standards for the corroboration of applications for asylum and withholding of removal. The previous rule was that "an applicant's testimony, 'if credible . . . may be sufficient to sustain the [applicant's] burden of proof without corroboration.'" *Wiransane v. Ashcroft*, 366 F.3d 889, 897 (10th Cir. 2004) (quoting 8 C.F.R. § 208.13(a)). Under the REAL ID Act, it is explicit that the IJ may require "evidence that corroborates otherwise credible testimony . . . unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). Indeed, Mr. Mahomed acknowledges the new corroboration standard in his brief, *see* Pet. Opening Br. at 31, but he has not made any argument in relation to that standard.

The second problem with Mr. Mahomed's argument is that he himself submitted the letters he now asserts the agency should have given very little weight. He does not cite any legal authority holding that we can simply disregard them. And he has failed to argue or show that the BIA erred by finding those letters to be of no meaningful corroborative value. And even if we were to disregard the letters he submitted to corroborate his application for relief, he has not shown, in light of our deferential standard of review, that the hearing testimony alone was sufficient to demonstrate that he suffered past persecution or had a well-founded fear of future persecution based on a protected ground under Tenth Circuit law.

The petition for review is DENIED.

Entered for the Court


William J. Holloway, Jr.
Circuit Judge